Charles E. Austin v. Commissioner. Margaret P. Austin v. Commissioner.
Austin v. Commissioner
Docket Nos. 835 and 836.
United States Tax Court
1944 Tax Ct. Memo LEXIS 77; 3 T.C.M. (CCH) 1106; T.C.M. (RIA) 44335; October 19, 1944
*77 Samuel Shapero, Esq., for the petitioners. Melvin S. Huffaker, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These proceedings were brought for redetermination of deficiencies in income tax as follows: 1939
1940
Docket No. 835
Charles E. Austin
$326.13
Docket No. 836
Margaret P. Austin
$215.83
595.03
Petitioner Charles E. Austin concedes adjustments by respondent as to $400 depreciation claimed on property on Boston Boulevard, and $163.75 insurance payment on petitioner's home claimed as a business expense. The remaining issue, common to both cases, is the correct composite depreciation and obsolescence rate to be applied to petitioners' gasoline stations. Findings of Fact Petitioners are husband and wife. They filed their income tax returns for the years in question with the collector of internal revenue for the district of Michigan. Charles E. Austin is sometimes for convenience hereinafter referred to as petitioner. Petitioners' business during the periods in question was selling at retail their own brand of gasoline at about 2 cents per gallon less than the general prevailing price for the purpose of obtaining *78 volume sales. They have constructed, bought, sold, leased, and operated gasoline stations in and around Detroit for about 18 years. In 1930 they operated 307 stations in Detroit. Petitioner Charles E. Austin owns one gasoline station subject to depreciation which station is located at Tireman and Livernois Streets, Detroit, Michigan. Petitioner Margaret P. Austin owns seven gasoline stations subject to depreciation, which stations are located throughout Detroit, at Elmwood and Vernor, Michigan and McGraw, Fenkell and Myers, Six Mile and Conant, Gratiot and Orleans, and in Flint. The stations owned by both petitioners are of the same general type. Of the eight stations involved six were built in 1938, one was built in 1939, and the other in 1940. The one owned by petitioner Charles E. Austin was built in 1938. A station as an operating unit consists generally of a brick building, underground gasoline tanks, gasoline pumps, concrete driveways, air compressor and hose, water hose and faucet, signs, and one or more flood lights. The costs of assets for the various stations involved were as follows: Equipment and appurtenance (excluding
pumps, but including storage tanks,
driveways, flood lights, hoist,
air compressor and desk)
Building
Pumps
Tireman and Livernois
$2,666.64
$2,506.98
$740.00
Elmwood and Vernor
2,930.95
1,962.37
740.00
Michigan and McGraw
2,851.99
2,576.98
740.00 *
792.00
Fenkell and Myers
2,377.84
2,616.39
370.00 **
396.00
Flint
2,505.12
2,041.05
820.42
Four Mile & Conant
2,232.46
2,629.15
828.00
Gratiot and Orleans
1,674.70
2,514.82
414.00
*79 The final depreciable cost of a station typical of those involved here is roughly divided about equally between the cost of the building itself and the cost of equipment, including driveways. The buildings in question are one-story brick and frame, about 12 feet by 20 feet. The Building Department of the City of Detroit classes these buildings as of the shed or barn type and estimates their life at 25 years. Petitioner Charles E. Austin has known the brick work to last from 20 to 25 years. His experience indicates a life of six or seven years for the shingle roof, a life of ten years for plumbing, and five years for gutters and eave troughs. Petitioner's experience with underground gasoline tanks has been that their length of life depends largely upon the condition of the soil in which they are embedded. In a soil containing a high acid content the length of life may be shortened to as little as five years, while *80 in good sandy soil a tank may last around 14 years. Most of the tanks are beneath or partially beneath parts of the station not covered by cement driveways. The driveways are constructed with a mixture of concrete which it is anticipated by the cement manufacturers' association will have a life of at least ten years. Petitioner's experience and estimate of the average life of the driveways in question is from seven to ten years. The gasoline pumps had average lives of five years. Petitioner's experience with air compressors has been that they did not in all instances have a life of ten years, but had a life of somewhat less than that; that they had an average life of about seven years; that flood light reflectors had an average life of three years. Petitioner's experience has been that a large element with reference to the life of gasoline stations in the past 20 years has been obsolescence traffic arteries and super-highways, causing marked decrease in business for stations not located on these favorable thoroughfares, and resulting in the closing and demolition of the station. Another was the change in gasoline retailing methods. The larger "one-stop" service station with all *81 automobile facilities including washing, tire repair and parking began to become popular in about 1940 when they constituted 10 to 15 percent of the gas stations in Detroit. Large oil companies were replacing their small stations with the new "super-service stations." In the last ten years the large oil companies have wrecked or abandoned approximately 70 percent of their small type neighborhood stations, replacing some of them with the "super-stations." Such small type stations had had an average life of about ten years. In 1938 petitioner estimated that the useful life of the station at Tireman and Livernois would not be more than ten years due to this change in station design, after which he would have to replace it with a "super-service" type station. By 1938 the trend was such that obsolescence of petitioners' stations could be foreseen. Without reference to obsolescence petitioner's experience has been that the useful life of the building on a small type station as a unit is about 15 years. The volume sales policy of petitioners subjected their stations to greater wear and use than the average station. None of the gasoline stations in question is today being used for the purpose *82 for which it was built. Some are being used in connection with the purchase and sale of used cars and others are being used for small temporary merchandising operations. Most of such use was not economically justified considering the frontage and value of the land and the placement and design of the buildings. The stations were closed by 1942. Petitioners were not able to supply the public with gasoline because under gasoline rationing it was impossible to get adequate volume and the stations were not able to supply supplementary service. On their books petitioners segregated the various depreciable assets for depreciation purposes. The 10 percent rate used by petitioners was adopted after consultation with a representative of respondent, and has been used on similar property for more than 15 years. Such determination was arrived at without reference to obsolescence. Petitioners claim depreciation on the gasoline stations as a complete operating unit, excepting the pumps, on a 10-year basis. Respondent determined that the gasoline stations, with the exception of the pumps, should be depreciated on the basis of 15 years' estimated life. The useful life of the gas stations here involved, *83 exclusive of pumps, is ten years, and of the pumps is five years. Opinion A motion to consolidate these proceedings was taken under advisement at the hearing in view of the petitioners' separate ownership of the respective properties involved. Since it now appears that the relevant considerations are sufficiently similar to govern both proceedings, the application is granted and the two cases will be discussed and disposed of in a single report. As in , petitioners' contention is that the economic life of their depreciable assets is shorter than their physical life and that accordingly the depreciation rate should be sufficiently high to enable them to recover their cost over the shorter period. If the facts support that position, the claim is justified. Under all the circumstances, we have reached the conclusion that the depreciation rate proposed by petitioners should be approved. In the first place, as in , the rate now contested by respondent has been applied for some years without controversy, *84 and in fact was originally adopted as a consequence of discussions with respondent's representatives. In the second place, the testimony shows that even the physical life of the component elements of the property was estimated to be as low as 15 years for the building, taking account of the accelerated depreciation of roof, plumbing, and gutters, and for the fixtures and equipment outside the building as low as seven years. The two being apparently about equal in cost and the parties having agreed that petitioners have properly adopted a composite rate (except as to pumps), the result would be an average life of only 11 years. Bearing in mind that petitioners' method of doing business is concededly harder on the physical assets employed than normal service station operation, it is easy to see that the 10-year rate cannot be seriously disproportionate to a reasonably pessimistic estimate of physical life. Finally, when to this is added the specific reference to petitioner's experience with respect to factors indicating the probability of premature obsolescence on economic grounds, it becomes even more difficult to reach the conclusion that the depreciation rate in question was sufficiently *85 at variance with reasonable estimates to justify its rejection. See . For the reasons stated, we have found as a fact that the anticipated useful life of the physical assets was the period claimed by petitioners. . Respondent's action in this respect is disapproved. If we understand petitioners' position, they further apply for our intervention in connection with a claim for refund not made or rejected until after this proceeding had been heard and not set forth or even suggested in the petition or at the hearing. Under the circumstances, we lack the requisites for considering or passing upon the claim, and must, accordingly, remit petitioners to their administrative remedy, which, incidentally however, may well prove adequate. Decisions will be entered under Rule 50.
Footnotes
*. January, 1938 installation. Four additional pumps were bought in July, 1939, at a cost of $792 and the first four were transferred to a slower station. ↩
**. 1938 installation. Replaced in July, 1939, by two other pumps and first two were moved to another location.↩